# In the United States Court of Federal Claims

No. 22-1582
(Filed Under Seal: August 29, 2023)
Reissued: September 14, 2023[1]

|  |  |
|---|---|
| MC2 SABTECH HOLDINGS, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant. | ) ) |

*Todd John Canni*, Baker & Hostetler, LLP, Washington, DC, for plaintiff.

*Mariana Teresa Acevedo*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

***SMITH*, Senior Judge**

This post-award bid protest is before the court on defendant's Motion to Dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims. Plaintiff MC2 Sabtech Holdings, Inc. challenges the award of delivery order SPE8EL-22-F-1964 to Atlantic Diving Supply ("ADS") as a Competition in Contracting Act ("CICA") violation. *See generally* Amended Complaint, ECF No. 16 [hereinafter Am. Compl.]. Plaintiff alleges that the delivery order is outside the scope of ADS's indefinite delivery, indefinite quantity ("IDIQ") contract because the subject product, a handheld Counter Unmanned Aerial Surveillance ("C-UAS") system, is not a commercial item. *Id.* Defendant moves to dismiss plaintiff's Amended Complaint and argues that the item is a commercial product within the scope of the IDIQ contract under the nondevelopmental item definition in Federal Acquisition Regulation ("FAR") 2.101, which therefore precludes jurisdiction. *See* Defendant's Third Motion to Dismiss, ECF No. 20 [hereinafter Def.'s Third MTD]. For the reasons set forth below, the Court grants defendant's Motion to Dismiss.

---

[1] An unredacted version of this opinion was issued under seal on August 29, 2023. The parties were given an opportunity to propose redactions, but no such proposals were made. *See* September 11, 2023 Joint Status Report, ECF No. 27.

**I.        Background**

The Defense Logistics Agency ("DLA" or the "Agency") administers the Special Operations Tailored Logistics Support Program (the "Program"). Def.'s Third MTD, Exhibit ("Ex.") 1 at 1, ECF No. 21-1 [hereinafter Def.'s Jan. 6 Decl.]. The Program is a multiple award IDIQ contracting tool that DLA uses to procure commercial items for logistical support of military operations, federal agencies, and other DLA customers. *See id.*; Defendant's November 30, 2022, Declaration, Ex. A, ECF No. 15-1 [hereinafter Contract]. On January 18, 2019, DLA awarded contract SPE8EJ-21-D-0020 (the "IDIQ Contract") to ADS under the Program. *See id*. The IDIQ Contract includes various commercial item clauses, such as FAR 52.212-4 – Contract Terms and Conditions – Commercial Items (OCT 2018). *Id.* at 9.

The Statement of Work ("SOW") specified that the Agency would procure special operational equipment, such as tactical equipment, "consist[ing] of commercial items and commercially modified items (commercial items requiring minor modification to fit military applications)." *See id*. at 43. DLA's Integrated Supplier Team Chief, John S. Cuorato, Jr., asserted that "only commercial items [would] be supplied under the resultant contracts" in the Program, and that "all non-[Price Evaluation List] items [would be] checked for scope, including commerciality, before being purchased." Def.'s Jan 6 Decl. at 1.

On June 15, 2022, DLA issued a Request for Quotations ("RFQ") to ADS, among other Program contract holders, for a C-UAS system. Def.'s Jan 6 Decl. at 3. The RFQ identified DroneShield's C-UAS product—the Drone Gun ("DG") MKIII—as meeting the Agency's requirement, but vendors could propose alternate products as permitted in the IDIQ Contract. *See, e.g.*, Contract at 45 ("Applicable alternate items will be permitted under the resultant contracts when an item is identified by a manufacturer's brand name or part number unless the Government expressly states that an alternate is not permitted."). On September 23, 2022, after the Agency received four quotations and completed its price reasonableness determination, the Agency awarded delivery order SPE8EL-22-F-1964 (the "Delivery Order") to ADS. *See generally* Defendant's November 30, 2022, Declaration, Ex. C, ECF No. 15-3 [hereinafter Delivery Order]. ADS filled the Delivery Order through its subcontractor, DroneShield. *See* Defendant's November 30, 2022, Declaration at 1, ECF No. 15; Defendant's November 15, 2022, Declaration at 3, ECF No. 10 [hereinafter Kemp Decl.]. On October 4, 2022, DroneShield published a press release on its website that the U.S. Department of Defense ("DoD") awarded the company a $1,800,000 contract. Compl., Ex. 1, ECF No. 1-2.

**II.       Procedural History**

Plaintiff MC2 Sabtech Holdings, Inc. and its affiliate, IXI EW, LLC ("IXI"), are U.S.-based manufacturers of C-UAS handheld technology. *See* Am. Compl. at 1. On October 24, 2022, plaintiff filed its Complaint with this Court alleging that DoD's procurement of the DroneShield DG MKIII violated CICA, the FAR, and the Defense Federal Acquisition Regulation Supplement. *See generally* Compl. Specifically, plaintiff argued that the Agency impermissibly awarded a sole-source contract to DroneShield. *Id.* at 19–21. On November 18, 2022, defendant filed a Motion to Dismiss pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that the Court lacks subject-matter

jurisdiction "because there is no contract between the Government and DroneShield, only a purchase by a prime vendor to fulfill an in-scope delivery order under the prime vendor's umbrella contract." Defendant's Motion to Dismiss at 1, ECF No. 12 [hereinafter Def.'s First MTD]. On November 30, 2022, defendant filed an identical Motion to Dismiss under RCFC 12(b)(1), except unsealed. *Compare* Defendant's Second Motion to Dismiss, ECF No. 14 [hereinafter Def.'s Second MTD], *with* Def.'s First MTD. On December 5, 2022, plaintiff responded to defendant's Second Motion to Dismiss. Plaintiff's Response to Defendant's Second Motion to Dismiss, ECF No. 17.

That same day, plaintiff filed an Amended Complaint that challenged the Delivery Order as exceeding the scope of the IDIQ Contract after discovering that DroneShield is a subcontractor for ADS—rather than a sole-source awardee. Am. Compl.; *see* Kemp Decl. On January 6, 2023, defendant filed a third Motion to Dismiss and reply in support of its prior Motion to Dismiss pursuant to RCFC 12(b)(1). Def.'s Third MTD. On February 1, 2023, plaintiff filed a Response to defendant's Third Motion to Dismiss. Plaintiff's Response to Defendant's Third Motion to Dismiss, ECF No. 22 [hereinafter Pl.'s Resp.]. On February 15, 2023, defendant filed a Reply in support of its Third Motion to Dismiss. Defendant's Reply in Support of its Third Motion to Dismiss, ECF No. 23. Defendant's Motion is fully briefed and ripe for review.

### III.   Standard of Review

To survive a motion to dismiss for lack of subject-matter jurisdiction, a complaint must "allege sufficient facts to establish the court's jurisdiction," under RCFC 12(b)(1). *Melwood Horticultural Training Ctr., Inc. v. United States*, 151 Fed. Cl. 297, 305 (2020) (citing *DaimlerChrysler Corp. v. United States*, 442 F.3d 1313, 1318–19 (Fed. Cir. 2006)). The Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The Court may "look to evidence outside of the pleadings to determine the existence of subject[-]matter jurisdiction." *Solute Consulting v. United States*, 103 Fed. Cl. 783, 790 (2012) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). "In determining whether a motion to dismiss should be granted, the Claims Court may find it necessary to inquire into jurisdictional facts that are disputed. . . . A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists." *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991) (citations omitted). If the Court determines that it does not have subject-matter jurisdiction, at any time, it must dismiss the action. *See* R. Ct. Fed. Cl. 12(h)(3).

### IV.   Discussion

Defendant moves the Court to dismiss plaintiff's claim because this Court lacks subject-matter jurisdiction over delivery orders, the subject contract of this protest. *See* Def.'s Third MTD at 1. Specifically, defendant argues that the Court does not have jurisdiction because the product at issue—DroneShield's DG MKIII—is a commercial product that falls within the scope of the commercial item IDIQ Contract. *See id.* Plaintiff alleges, conversely, that this Court *does* have jurisdiction because the DG MKIII is *not* a commercial product and exceeds the

3

scope of the IDIQ Contract.  Pl.'s Resp. at 2–3.  Therefore, to evaluate jurisdiction, this Court must examine whether the Agency's Delivery Order for DroneShield's DG MKIII fell within scope of the IDIQ contract.  *See Rocovich*, 933 F.2d at 993; *see generally Solute Consulting*, 103 Fed. Cl. at 790–95 (evaluating the factual record to determine whether a task order exceeded scope of the underlying contract when ruling on the defendant's motion to dismiss for lack of subject-matter jurisdiction).  The factual inquiry, consequently, turns on whether the Agency's determination of the DG MKIII as a commercial product was reasonable.

      A.      **Agency Decisions of Commercial Product Determinations**

The Court will defer to agency decisions unless the protestor shows that "the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Arch Chems. Inc. v. United States*, 64 Fed. Cl. 300, 384–85 (citing 5 U.S.C. § 706(2)(A) (2005)).  An agency decision will be found arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

The deference that this Court affords to an agency decision necessarily includes an agency's determination of its needs.  "A procuring agency enjoys broad discretion to determine its own needs, and that determination, including any restrictive provisions, will be sustained unless unreasonable." *Savantage Fin. Servs. v. United States*, 150 Fed. Cl. 307, 318 (2020) (citing *Savanatage Fin. Servs. v. United States*, 595 F.3d 1282, 1286–87 (Fed. Cir. 2010)).  When determining its needs, the agency must conduct market research to discern whether commercial products, commercial services, or nondevelopmental items are available.  *See* FAR 12.101(a).  The FAR defines "commercial product" as a product that meets any one of six definitions.  FAR 2.101.  This Court finds three definitions salient here:

> (1) A product, other than real property, that is of a type customarily used by the general public or by nongovernmental entities for purposes other than governmental purposes, and–
>
>     (i) Has been sold, leased, or licensed to the general public; or
>
>     (ii) Has been offered for sale, lease, or license to the general public;
>
>     . . . .

> (3) A product that would satisfy a criterion expressed in paragraph (1) . . . of this definition, except for-
>
>> (i) Modifications of a type customarily available in the commercial marketplace; or
>>
>> (ii) Minor modifications of a type not customarily available in the commercial marketplace made to meet Federal Government requirements. "Minor modifications" means modifications that do not significantly alter the nongovernmental function or essential physical characteristics of an item or component, or change the purpose of a process. Factors to be considered in determining whether a modification is minor include the value and size of the modification and the comparative value and size of the final product. Dollar values and percentages may be used as guideposts, but are not conclusive evidence that a modification is minor; [or]
>
> . . . .
>
> (6) A nondevelopmental item, if the procuring agency determines the product was developed exclusively at private expense and sold in substantial quantities, on a competitive basis to multiple State and local governments or to multiple foreign governments.

FAR 2.101.  The Court will consider these definitions with the facts underlying the procurement when examining the reasonableness of the Agency's commercial product determination.  *C.f. Precision Lift, Inc. v. United States*, 83 Fed. Cl. 661, 665–66 (2008) (finding awardee's product satisfied the regulatory definition of a commercial, nondevelopmental product after protester challenged agency's acceptance of product as commercial, which was required by the solicitation).

### B. DroneShield's DG MKIII is a Commercial Product.

Defendant argues that this Court lacks jurisdiction to review plaintiff's claims because DroneShield's DG MKIII is a commercial product under FAR 2.101, which falls within scope of the IDIQ Contract.  Def.'s Third MTD at 3 (stating that the DG MKIII is a commercial product because "it is a nondevelopmental item sold in bulk to foreign countries" under FAR 2.101(6), or alternatively, it is similar to or 'of the type' of product customarily used by and offered to the general public" under FAR 2.101(3)).  Plaintiff, conversely, focuses solely on the definition of commercial product at FAR subdivision 2.101(1) and argues that the DG MKIII cannot meet this definition because it has not been "sold, leased, or licensed to the general public," making the Delivery Order out-of-scope and within this Court's jurisdiction.  Am. Compl. at 27.  For the reasons set forth below, the Court agrees with defendant that the Agency acted reasonably in its commercial product determination, making the Delivery Order within scope and outside this Court's jurisdiction.

"Subject-matter jurisdiction is a threshold matter that must be addressed before the Court evaluates the merits of plaintiff's claims." *Feiss v. United States*, 138 Fed. Cl. 237 (2018*)*; *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Relevant here, the Federal Acquisition Streamlining Act ("FASA") of 1994 limits this Court's jurisdiction over protests of task and delivery orders. 10 U.S.C. § 3406(f). Task and delivery orders can only be protested before this Court "on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued . . . ." 10 U.S.C. § 3406(f)(1)(A). "[T]he Federal Circuit, the Court of Federal Claims, and the GAO all analyze whether a . . . [delivery] order increases the scope of the underlying contract by comparing the scope of work described in the . . . [delivery] order with the scope of work described in the underlying contract." *Solute Consulting*, 103 Fed. Cl at 793. Therefore, whether the delivery order increases the scope of the IDIQ Contract, is a question of whether the procured product—solicited under a commercial contract—was indeed a commercial product. *See* Am. Compl. at 25–28; Def.'s Third MTD. This Court, in turn, examines the reasonableness of the Agency's commercial product determination.

Here, the Agency needed compact, lightweight handheld C-UAS systems—or technology to detect and counter drones—to fulfill the mission requirements of the U.S. military. Def.'s Second MTD at 3; *see generally* KELLEY M. SAYLER, CONG. RESEARCH SERV., IF11426, DEPARTMENT OF DEFENSE COUNTER-UNMANNED AIRCRAFT SYSTEMS 1 (2023). At the outset of this procurement, the Agency conducted acquisition planning and determined that the DroneShield DG MKIII fell within scope of the IDIQ Contract and met the definition of a commercial item under FAR 2.101. Def.'s Jan. 6 Decl. at 1, 6 ("All non-[Price Evaluation List] items are checked for scope, including commerciality, before being purchased."). Specifically, Mr. John Cuorato determined that DroneShield's DG MKIII "[met] the definition of 'commercial item,'" or "at a minimum, a nondevelopmental item, developed at private (non-U.S. Government) expense and sold in substantial quantities to foreign and other governments." *See* Def.'s Jan. 6 Decl. at 2–3, 6. Mr. Cuorato reached this determination by reviewing publicly available information on DroneShield's website that noted DroneShield was a private, non-governmental company and that highlighted past sales of the DG MKIII to commercial customers (e.g., airports, event and stadium venues, and correctional facilities) and sales of similar products to NATO militaries and GSA. *Id.* at 2–3. DroneShield's CEO, Mr. Matthew McCrann, confirmed that the DG MKIII has been "sold in substantial quantities, on a competitive basis, to . . . multiple foreign governments" including the United Kingdom, the Netherlands, Switzerland, Hungary, France, Malaysia, Chile, Poland, Indonesia, and Thailand. Def.'s Third MTD at 4 (citing Def.'s Third MTD, Ex. B (McCrann Decl.), ECF No. 20-2). Mr. Cuorato also examined the differences in DroneShield's products and determined that the products "do not differ substantially in performing one or both of the following functions: detect and track, and defeat," with no differences in the major operating principles. Def.'s Jan. 6 Decl. at 2. Mr. Cuorato acknowledged that the Federal Communications Commission has not authorized use of the DG MKIII in the United States, but that

> this in and of itself does not keep the item from being "of a type" sold to the general public with modifications and/or minor modifications made to meet Federal Government requirements, and therefore commercial, as there are many

commercial products that cannot be sold or utilized without Government authorization in advance.

*Id.* at 3.  Finally, Mr. Curato, in recognizing the DG MKIII as a nondevelopmental item, compared it to other commerciality determinations for similar items issued by the other components within DoD, such as the U.S. Navy.  *Id.*

Based on the foregoing, the Court finds that the Agency reasonably determined DroneShield's DG MKIII met the requirements for a "commercial product."  First, the record illustrates that the Agency reasonably determined that the DG MKIII satisfied the government's need for commercial special operational equipment.  Def.'s Jan. 6 Decl. at 2–3; Def.'s Nov. 17, 2022, Decl. at 2, ECF No. 11.  Second, the record establishes that the Agency reasonably determined, after thorough inquiry, that the DG MKIII fell within scope of the IDIQ Contract, as required by the Determination of Commerciality, because it was indeed a commercial product.  *Id.*  The Agency evidently considered the definition of "commercial product" in the FAR and applied these criteria to the facts before it.  Specifically, the Agency reviewed DroneShield's modifications to the DG MKIII to discern whether they were "minor," FAR 2.101(3), as well as examined DroneShield's sale of the DG MKIII to the general public and foreign governments in substantial quantities, FAR 2.101(6).  Def.'s Jan. 6 Decl. at 1–4.  Because the Agency's commercial product determination can be reasonably discerned by the record, this Court will uphold the Agency's decision.  *See Bowman Transp.*, 419 U.S. at 286.  Therefore, this Court lacks subject-matter jurisdiction to review plaintiff's claims because the Delivery Order for DroneShield's DG MKIII falls within scope of the IDIQ Contract.

Finally, the preceding factual inquiry is determinative of jurisdiction and is properly before this Court.  *See Rocovich*, 933 F.2d at 993; *Solute Consulting*, 103 Fed. Cl. at 790–95.  Plaintiff does not substantively respond to the Agency's commercial product determination in its response to defendant's dispositive briefing, but rather requests that this Court deny defendant's Motion leaving issue of commercial product determination to a merits hearing.  This puts the cart before the horse.  Plaintiff must make a sufficient factual showing to justify jurisdiction before addressing the merits.  *See Rocovich*, 933 F.2d at 993 (citing *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936)).  As such, the Court finds that plaintiff did not meet its burden of establishing jurisdiction.  *Id.*

V. Conclusion

For the reasons set forth above, defendant's Motion to Dismiss, ECF No. 20 is hereby **GRANTED**.  All other pending motions are hereby **DENIED AS MOOT**.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge